Good morning, counsel. Mr. Swanson, are you ready to proceed? Go ahead. Good morning, your honors. May it please the court, my name is Matthew Swanson, and I am the attorney for the appellant Randall L. Seaver, who is the Chapter 7 trustee in the underlying bankruptcy case and the plaintiff in the underlying adversary case. The trustee has appealed the bankruptcy court's determination that the defendant, Ms. Glasser, is not a non-statutory insider, which is a determination which is key to the trustee's avoidance claims under both federal statutes and Minnesota statutes. The Eighth Circuit precedent on this issue is somewhat scant. We're left with a 2006 decision from the Bankruptcy Appellate Panel in Inouye Rosen and a footnote in a 1984 Eighth Circuit decision in Matter of Newcomb. If we look at the insight provided by Congress in regards to the insider statute, Congress has stated in its report, an insider is one who has a sufficiently close relationship with the debtor that his conduct is made subject to closer scrutiny than those dealing at arm's length with the debtor. Congress and courts have picked up on two considerations for an insider relationship, one being a closeness of the relationship and two being the arm's length, whether or not the transaction was conducted at arm's length. Can you talk about the significance of the transaction being at arm's length? Because we're talking here about a payment, which was some years after the transaction. So even if we assume that the transaction itself, the original transaction, was not at arm's length, and even if we assume that that makes the defendants insiders at that time, why would that mean that they're still insiders at the time of the payment? Yes, that's a good question. Thank you. You're welcome. When we're looking at the transaction, we're looking at it as a whole. I mean, the time of the payment is relevant, and in this case, the transaction was entered into in March of 2011. The defendant was paid in April of 2014, so it's just over a year from which the timing was paid. When we're looking at the relationship between the parties, and the court did look at the facts at the time the transaction was entered into and the terms that Ms. Glasser received in that transaction and establishing that it wasn't arm's length. Now, your question being, well, how does that translate to the time that the payment is made? Well, in this case, we don't have any intervening facts that would establish that their relationship, the relationship between Ms. Glasser and her former spouse, Mr. Pommaget, who's the principal of the debtor, changed. To the contrary, we see that after Ms. Glasser entered into this transaction, she became an employee of the debtor, and this was shortly after the transaction was entered into. She had not been an employee prior to that time? Not prior to the transaction. Well, we keep using the word transaction. I apologize. No, you're fine using it, because that's what the legislative history says. It says that the transaction between Applee and debtor was not at arm's length, da-da-da-da-da. But what transaction? Is the transaction the payment? I believe that's what that is. The making of the loan. It's part of the transaction. And I don't mean to confuse it, but that's consistent with the 8th Circuit precedent, the limited 8th Circuit precedent that we have, and other cases as well. You look at In re Rosen. They looked at the parties' dealings before entering into the agreement and how that affected the ultimate payment in the case. Because ultimately, we're trying to establish what the relationship is between the parties. Is your point, then, that she became an insider because she was the ex-spouse of the owner of the company, or because she was an employee that had made a loan? I guess I'm not clear on that. Yeah, in our argument that it's a multifaceted conclusion. I mean, we're looking at the totality of the circumstances in establishing the relationship. Clearly, the bankruptcy court has held that the parties did not act at arm's length when entering into this agreement. And we are asserting that that is because of their pre-existing relationship. That was close enough to result in that non-arm's length transaction. Okay, and what part of that pre-existing relationship, the fact that she was an ex-spouse? She wasn't even an employee at the time of the loan. Yeah, I understand that. And I say, and that's why I argued that her becoming an employee just creates one additional nexus to her becoming an insider or being an insider at the time of the payment. But as an employee, is there any evidence that she had any influence over what payments were made and when they were made? As an employee alone, no. What it does establish is just another connection with the debtor. She worked 11 feet from the president to the company. But isn't the goal here, and Congress didn't help very much, but isn't the goal here really to determine whether a person is in a position to influence the payment of the debtor, the payments of the debtor? And if that's true, then what evidence is there that she was in that position? And I'll get to the evidence in one second. But just to touch base on the goal and intent of Congress, if we're looking at the legislative report, it states the one who has a sufficiently close relationship with the debtor, that is, conduct is made subject to closer scrutiny than those dealing at arm's length with the debtor. It doesn't mention influence. We can assume that if they have a close relationship, there's going to be an affinity, and the debtor is more likely to favor or give preferential treatment to that creditor. But as an employee, just your garden variety employee isn't presumed to have that influence? That's correct. And someone who had been divorced from the owner of the debtor for I think it was 15 years isn't presumed to have that influence? Yes. So you're really relying on the original loan as being the basis for the insider status, aren't you? I'm not. I rely on the loan being evidence that an insider status already existed, that a close relationship between the parties already existed. But isn't there also a knowledge requirement at the back end with regard to payment and insolvency? And I guess I don't see anything in the record that indicates that Ms. Glasser had that requisite knowledge under the Minnesota statute that says that they were aware of the insolvency at the time the payment was made. There is under the Minnesota statute a requirement that she have reason to believe that the debtor could be insolvent. The Bankruptcy Court deferred its ruling on that. Obviously, it didn't see the need to reach that conclusion or reach that issue. However, I do think there is evidence in the record, one by the fact that her repayment terms were 90 days, and she didn't receive repayment on this agreement for over a year. She also testified that it wouldn't surprise her that if she didn't get repaid. Doesn't that just prove the opposite of your position, though, that she wouldn't have been surprised? So how could she have exercised influence then? Well, the problem is, in this case, and it does go to whether or not she can influence the timing of the payment, which was an argument raised by the appellee, is the debtor was very cash tight. The only way anyone was going to get paid was if there was an infusion of capital into the debtor. And when that infusion— That did happen, right? $4 million came in in early April or in April of 2012. And what happened with that $4 million? And that's when Mr. Pommaget made the decision to pay certain categories of creditors. And how did she influence that decision by him to pay certain creditors? Well, if we stack her up against other creditors in the case, even insiders, was she in a position to receive preferential treatment? We can look at, one, her history of transactions with Mr. Pommaget. She's invested with him a number of times, and they've failed. But she had also had one success. I think it was Funcoland or something. Exactly, Funcoland. And didn't she—wasn't her testimony that because he had been successful before and because he was willing to pay a good interest rate, they wanted to make this investment? I don't know if she said pay a good interest rate, but she did say—she was saying he did have one. I think she said investments, but the only evidence in the record is the Funcoland investment, which was in the early to mid-'90s. Since then, she'd invested in two other companies and then the debtor and lost her money on both of those deals, one of which was very recent to her investment with the debtor, and that would be the second swing investment, where Mr. Pommaget guaranteed that loan as well and never repaid her. So if he had a sketchy record of repayment, isn't that a justification for only lending him money at a higher interest rate with more favorable terms? It would be a consideration if she'd reviewed the financials of the debtor. Well, she knew she hadn't gotten paid on prior loans. Isn't that good enough? Yeah, and that's where you look at the Tarragon decision, the bankruptcy court decision in In re Tarragon, where it's looking at a personal guarantee and how that's used by a creditor in a transaction where she hasn't reviewed the financials of the debtor, she hasn't reviewed the financials of the guarantor, and she's using that guarantee. I mean, her only expectancy is that she's creating a situation where Mr. Pommaget is incentivized to repay her over other creditors because he would otherwise be penalized and have that personal liability. Can I switch gears on you for just a moment? With respect to the first bridge loan, which I think this loan was part of the first series of bridge notes, could you help me out with the record as far as which of those lenders got paid and which did not? In regards to the first bridge loans, yeah. My understanding, and if this isn't clear from the record, there was a Mr. Ross and Mr. Helm who were both officers of the debtor, and there's Mr. Pommaget who had made bridge loans to the company. They were repaid. There were the Mangaleks who were creditors and somewhat business partners. They did not get repaid. And then there was Ms. Glasser who did get repaid. So there was an original bridge note lender outside party that did not get repaid? That is correct. And then you have Ms. Glasser who is getting repaid, obviously. And then there was an example set forth in our brief which came up at trial of a Duane Wormerskirchen who was a co-founder of the company. He had lent money to the company prior to Ms. Glasser's loan, promised repayment when funds came in, similar to Ms. Glasser. Funds came in, he was only repaid a portion of his loan, whereas Ms. Glasser was repaid a full amount of her loan. But he was truly an insider, wasn't he? And he was truly an insider, yes. And we brought this up because the bankruptcy court found that Mr. Wormerskirchen was more poised to exert control over the debtor than Ms. Glasser. However, when the funds came in, he clearly did not get repaid and she did. So the bankruptcy court held that fact against us, cutting against our position that she was receiving preferential treatment when that is just not a logical conclusion. If she's getting payment over Mr. Wormerskirchen, how does that show that she doesn't have some sort of affinity or preferential treatment over Mr. Wormerskirchen? Or maybe it just shows that Mr. Pomge didn't believe she was an insider, so he was paying those folks first. I don't think there's any evidence in the record that he was paying non-insiders. So help us square the fact that the court found that there wasn't a sufficient closeness between the parties, but yet the court also found that the loan itself was not at arm's length. How do those two go together? I'll try to be quick because my time is running out. But that is the issue. There is a clear disconnect in this case. The bankruptcy court's examination of Ms. Glasser's relationship with Mr. Pomge was simply clouded by his focus on control. The bankruptcy court actually stated in a footnote that you don't need control in order to find non-statutory insider status. However, the bankruptcy court went on to state ten times that she didn't have control over the debtor. So somehow he's saying on one hand you don't need control, but then using control as the element to- And so what you're saying is that the nature of the relationship itself can create the status of an insider? Correct. Right. And the court here specifically found that they did not have a sufficiently close relationship. So I guess my question is why shouldn't that be the end of the case? Because we look at the transaction, the actual transfer, and the bankruptcy court found that it wasn't an arm's length transaction. And you can't get to a non-arm's length transaction without having closeness. Right. I mean, that's the same argument I know. But you can have closeness and have an arm's length transaction. You can't have a non-arm's length transaction and not have closeness. That's why I'm saying the bankruptcy court committed error in finding that there wasn't closeness and examining all those factors. In light of the fact that it found, clearly found, that it wasn't an arm's length transaction, I'd like to reserve my last 45 seconds. Thank you. Thank you. Mr. Beebe? Good morning, Your Honors. Counsel. My name is Alex Beebe. I represent Ms. Glasser, the defendant in this matter. And we are cross-appealing merely to protect our interests in case of an adverse ruling. I think Your Honors have focused on the core of this issue. There are two aspects. There's relationship and timing that we're concerned with. The relationship and both of these aspects actually go to the core of why does the bankruptcy court have this extended preference period. It's to protect legitimate creditors from creditors who have a special relationship and would use that relationship to bypass or prefer themselves in distribution. And the bankruptcy court here found that Ms. Glasser just simply did not have that kind of relationship. She didn't have that kind of relationship throughout the entire transaction. And there are individual findings. There were additional findings particularly relevant at the time of the transfer. In fact, the court based its finding that there was no influence in part on the aspect that Mr. Pommaget did not concede or that Ms. Glasser wanted payment prior to when she actually got payment, and Mr. Pommaget did not acquiesce. And there were statements made in court that in fact she had asked several times multiple people when she was going to get paid. And she stated that she was rebuffed when she asked these questions. This certainly does not indicate any sort of influence whatsoever. And these incidents happened after the transaction was entered into. These are additional facts that I guess would contradict anything that happened at the start of the transaction and would belie any sort of influence that may have existed at the start of the transaction. And, of course, the bankruptcy court found that there was no influence throughout the entire transaction. She had not – oh, go ahead. Yeah. I was just going to say she had made prior loans that she had not been repaid. Is that correct? Yes, that is correct. And so did she become the squeaky wheel only after she became an employee, or was she also attempting to exert influence or control in her position as ex-spouse on those prior loans? Does the record reflect that? The record, to my understanding, does not reflect that. I know it's certainly not something that the bankruptcy court focused on, but I do not believe that the record reflects that. Thank you. I guess back on this whole issue of what is the transaction, I keep focusing on the transaction being the payment, not the making of the loan. And with that focus, somewhere in your brief you say, indeed, the evidence shows that the glassers were repaid at the same time as the other bridge note holders. That's correct. Some of the other bridge note holders or all of the other bridge note holders? As Mr. Swanson mentioned, I'm not completely familiar with how when everybody was paid. I do know that there was a private placement memorandum that went out to all investors and potential investors, and that specifically listed Ms. Glasser's loan and stated that that loan would be repaid when the capital funding came in. And that's typical for a bridge loan. So that was part of the private placement memorandum for the funding that came in or for the bridge loans? I'm not completely clear exactly when that went out. It was definitely out for the funding that came in. And I'm not sure exactly whether that private placement memorandum was out before or after Ms. Glasser actually made her loan. So that funding, though, what you're saying is earmarked for this loan among others? Correct. And we can find that in the records somewhere? Yes, I believe that's in the records that that private placement memorandum went out. I'm not sure if it directly says that the new funders received that, but the private placement memorandum was what was being used to request funding, and there is evidence on the record of that. So your honors have also focused on kind of this link between the closeness analysis, the relationship analysis, and the transaction transfer, the repayment of the loan, and whether or not there's arm's length. The court's arm's length finding, I think there can be a conflict between the two. However, I think it's important to look at exactly what it is that the court decided and how they made their determination on the arm's length aspect of things. This wasn't a slam dunk arm's length finding, for one. The court looked at one list of potential factors, listed what those factors were, made no analysis whatsoever, and then just came to the conclusion that it was not an arm's length transaction. And when the court was referring to the time the loan was made. Exactly. And particularly the findings that appellant focuses on are all relevant at the time the loan was entered into, which is not the relevant time for when the repayments were actually made, which is what we're concerned about. That's what the preference period is concerned about. With regard to the transaction issue, when you talk about the totality of the transaction and the note and the terms that were negotiated, did Penny Glasser do that or did her husband do that? Her husband negotiated, and there's evidence on the record. However, the bankruptcy court did not even discuss Mr. Glasser's involvement. Did not make a distinction between the two of them in terms of who was the insider? No. No. And we contend that that was an error. Or at least it should have been somehow addressed. So you appealed, you cross appealed on the finding that this was not an arm's length transaction, whatever the transaction is. Is it necessary for us to find that that portion of the decision was clearly erroneous in order to affirm? No, absolutely not. In our opinion, it's all about the relationship. Was she an insider or not? And that focuses on the closeness aspect. And court after court after court has just looked at closeness. If they don't find closeness, they don't even deal with the arm's length. It's kind of a fail-safe. Because we've extended this non-statutory insider preference period, since we've extended beyond the statutory list, I think courts have looked at the legislative language and considered that, okay, we're only concerned if they're both an insider and the transaction itself, the repayment at issue, was not at arm's length. If the relationship wasn't close, then we really don't even need to ask. And so I just want to understand what you're saying. Are you saying that the goal here is to determine closeness and the nature of the transaction, whatever that is, can be a factor in determining closeness, but it's not given the same weight? It's just a factor in determining closeness? Yes, I believe that that is the case. And the courts have repeatedly, I mean, even the Eighth Circuit Bankruptcy Panel, this panel in Rosen, did not even address. They looked at closeness and then did not touch the arm's length aspect of things. So just so I'm clear, the closeness comes first, then the arm's length? Yes. Or are they actually two separate things? Well, the legislative history refers to closeness, correct? Correct. Yeah, legislative history makes it a little bit more complicated, but, you know, court after court after court, I mean, even the Terracon court says that you have to find closeness. I mean, appellant said that you can't have a non-arm's length relationship without closeness. And I think on the surface that might make some logical sense. When you actually look at what the arm's length relationship was, the non-arm's length relationship was that the bankruptcy court found, it's all concerned about stuff that happened at the beginning of the loan. It's not concerned about what happened at the actual payment. And the nature of the relationship is the important piece in the non-statutory insider preference period. And so, I mean, I think that's the key here. The other investors that were not paid in full, was that based on, I mean, were all of these bridge loans, did they come at the same time or was repayment based on the timing of the original note or how were those decisions made? Is there anything that clarifies that in the record or is it just that other people didn't get paid in full? Your Honor, honestly, my familiarity with that aspect of things is not clear. My reading of the record doesn't provide me any insights into that, so I'm not sure if that was really reflected in the record. I know it certainly was not a concern by the court. And regardless of what the bankruptcy court found, they certainly did not find that the timing of payments suggested some sort of preferential treatment. All right, if Your Honors don't have any further questions, I'll cede the remaining of my time.  Thank you, sir. Can you please put two minutes on Mr. Swanson's rebuttal time because Judge Fetterman was picking up a lot of time. I appreciate that. Your Honors, the bankruptcy appellate panel in Inouye Rosen stated, an insider is one who does not deal at arm's length with the debtor. In the Tenth Circuit, in Inouye U.S. Medical, Inc., the court similarly held that a non-statutory insider by definition is not operating at arm's length with the debtor. The bankruptcy court made this determination that this wasn't an arm's length transaction because of the party's relationship. That's ultimately what it comes down to. At the time of the loan. At the time of the loan, exactly. And Ms. Glasser stated, she testified, regardless of who negotiated the loan or the terms of the loan, Ms. Glasser stated that the loan was made as a result of her relationship with David Pommachet. So they had that relationship entering into the transaction. Well, but isn't that true? I'm sorry, I'm going to use more of your time. Isn't that true in a lot of lending relationships that aren't insiders? You had good results from a loan to someone previously, so you make them another loan. That doesn't make you an insider, does it? It could be. And that's what you have in In re Rosen, where there's a course of conduct where he's getting repaid on time with interest. We don't have that here. I mean, she doesn't have a history, any recent history. I mean, in the past. Well, she'd made three loans with him, and one was a big success, right? And that really wasn't even a loan. I mean, she was married to him at the time that he owned Funkoland and received part of that. You know, the following transactions were all failures. And so she came into this deal willing to lend the debtor $200,000 without performing any due diligence whatsoever. I mean, that was their relationship at the time that the transaction was entered into. And as I argued before, if anything, the relationship only became closer as it proceeded to the actual payment date. I mean, nothing changed. There was no intervening incident that changed from that time to when she was paid. The relationship only became closer as a result of her becoming an employee of the debtor. And therefore, we say that the bankruptcy court erred in not finding closeness between the parties. And therefore, we ask that the panel reverse the bankruptcy court's determination. Thank you. Thank you. Court's adjourned.